Good morning, I'm Richard Marks for Wellington Playtests. I'd like to reserve approximately three minutes for quoting very well. Thank you. We're here today because the trial court made two essential errors. One is it had a misperception of the basic rule of Janiricide. I'll read a quote later, but it basically held the reverse of what the philosophy is behind the Janiricide of the trademark. Based on that misperception, the trial court weighed the evidence, discounted and dismissed all categories of evidence, and disparaged both the plaintiffs and their experts in order to reach the conclusion that Mark cannot be considered. The real issue here is whether or not there has been an establishment of genuine issues of the general fact. I can present to this court a summary of the categories of evidence that were reported. There are a lot of categories of information. It took approximately 15 volumes of excerpts in order to present. There were surveys. There was both a thermos survey presented by the plaintiffs, and there was the Google search surveys. There was dictionary usage, the college dictionary and dictionary.com, both listed definitions in a generic sense to search the Internet. The verb usage, we presented two linguists that identified the verb usage as a generic usage. I'm not sure whether it was the district court, whether it's a homeowner, maybe it came from some other source, but the district court articulated an indiscriminate verb versus a discriminant verb, which I thought was a pretty helpful approach to the analysis. It was an interesting approach. It was a brand-new approach. So it was. It was creative. It was. We had surveyed the entire landscape of generic cases that involved generosity. There was not a single reported decision that talked about the verbing of trademarks in the United States. So, yeah, I thought it was helpful because, as I understand it, the indiscriminate use would be to Google something, meaning to search the Internet, and the discriminant use would be to refer to the Google search engine. That's what I understand. Well, it's a district court's distinction to me. It's nice, but the law is, what is the primary significance of the use of the relative to consumer product? It's not whether or not they're used indiscriminately or indiscriminately. Instead, the trial court adopted the expert's thing that sometimes is a new word for me, cynical, where discriminant use, and I'm not using the trial court's definitions, but discriminant use had a cynical effect that it somehow identified the verb. But it looked to me like one of the flaws in your studies, and I guess one or two of them were studies that you yourself compiled. Basically, those studies failed to ask about the discriminant use, and the question is, essentially, does the consumer understand that Google means a specific search engine or a registered trademark of Google? Okay, well, first of all, yes, those two surveys were projected or were designed by our offer, but they were actually run by Google. It was their consumer service, but I guess that's the answer. Yeah, that's right. So it's an addressable flaw. Yes. Well, I don't know if it's a flaw necessarily, because we tested whether it had discriminant or indiscriminant, because that was a flaw that doesn't exist. The flaw that existed at the time we ran the surveys was whether it knows the source to the question before us. In other words, if the consumer understands that there is a difference between searching the Internet and the shorthand version of which is to Google it, and the consumer also knows that it is a registered trademark of a company, Google means, then have you necessarily established a genericization? I think we have. But the reason why it hasn't had my Coca-Cola, it's different because of substance. There's tribal issues and general issues as to whether or not that was a primary source of discrimination. To what extent? Your evidence doesn't address that. Well, the surveys are nothing. Well, the evidence, if you throw out the surveys, we have ten other categories of information. We have the American Dialect Society's determination that, in the generic sense, to search the Internet without reference to Google was the word of the decade. We have dictionary uses, which the uncontrolled by Google, after they said how letters they need to include an initial definition, those there are definitions that exist that don't reference the Google engine. It says, search the Internet, definition one. Search the Internet using Google, definition two. We also present. But even the deep theories that you refer to all recognize both the generic and the, I'll call it, discriminant terms. They do, and I think that's a tribal issue that needs to be determined by ensuring generics is a factual question. But if the jury understands there's a difference between generics, if the average consumer understands that there is a distinction between the two, why have you established genericization? It just means that you've developed a shorthand term, and that everybody else comes from the preeminent search engine on the Internet. That's exactly what happens with genericism. If you look at the words that have been re-generic, people use Escalator, to mean a moving staircase. And the court said, sorry, I know you've spent a lot of time developing this, marketing it, but you've done so well, and everybody knows what this moving staircase is. It's an escalator. We're going to top it. Yo-Yo, Aspirin, Heroin, these are all generic forms of the trademark that the owners were not happy about, and that people understood may have come from a brand. But when the public at large adopts its primary significance as a general term to say search the Internet, one thing is I'm asking is why can't the public understand both? And if that's the case, why does that? They may understand both. Okay, but what needs to be tried at court before a jury is whether the primary significance, 51% of people, is presented by the evidence, understand it to be with or without. But the district court had the evidence, I guess the defendants presented, which showed that a much higher percentage of the people sort of really understand that that is the mark of Google. But the problem is that your evidence didn't address that, and the district court found essentially, I guess, in a gateway analysis that it wasn't reliable evidence. So what material issue of that remains to be tried? What was very interesting is that the Teflon survey used by Google did not address the verbing issue. There is no standard for verbing, and the trial court created a standard. They said that on the one hand, verbing, it's not trademark use. But if it is somehow trademark use, then to say it was illegal. When we turn on semantics, is that what this case is all about, or is it what is in the mind of the average person who uses the Internet? Does that person recognize and acknowledge that this is, in fact, a registered trademark? The Teflon survey performed by Google did not test whether the public understood the verbing, the verb use of a word, which is now a root word in 100 different languages. To each search, it's on Google Gold, Google List, it has all its variations. Their Teflon survey addressed whether the product, the search engine, was a brand or a thing. What our survey has addressed is whether the use as a verb was known primarily with or without Google. And our surveys created evidence which, whether or not the court wants to accept them, it's not the function of the survey judgment. Well, if the surveys themselves are otherwise admissible, do you still have to get a court to give an injury or a verb to you? We do, and we did. We had Mr. Berger's survey. We had a Thermos survey, which showed more than 50% of the people in the court dismissed on the act. But the district court essentially didn't like it. Well, he exercised his game-keeping function and concluded that it was not a reliable survey, and I think he elaborated Mr. Berger's, he narrowed the opinion that Mr. Berger could offer, but ultimately concluded with the dearth of evidence on the plaintiff's side that there was none of the terrible evidence. I take issue with the dearth of evidence. We had two surveys. We had two-year usage. We had two linguists. We had an alphabet slogan. By the way, no changes in the alphabet. We had Google's own use of Keep on Googling. We had the failure to police. We had a very minimal budget. We have 900-plus domains on Google. Don't get any from Oxford. What's the purpose of doing that? Of what? Of going out and registering 900 domain names? We did. We registered 700. It was horrible. We registered 8,000. What was the purpose? Well, yeah, let's do a classic cyber squad. No, the plaintiffs here were not. What were they doing? Why did they do it? The first thing that we must note is our complaint has no deal in front of it whatsoever. The reason they went out and did it, they were working on a patent that they were trying to figure out how to secure squatters, other squatters, how to protect and defend the squad from the African squatters that were there. Well, they weren't squatters. They were other squatters. Because at the time this was happening, the predominant use of the word Google was search. And the trending word on search engines was Google. So they combined Google, meaning to search, with a mail. And when you combined search with a mail on mobile devices, you were asking the search engine to search for that information, and you were getting a higher rate of return. That was the theory. They were testing that theory. It's academic. And they were not making any sense. What would happen if somebody searched the Internet for one of your registered domain names? Where would it take you? Most would know a couple of some other sites for some other academic purposes. There was not a significant amount of dollars being generated. I thought I read something in the record about some sort of an adult site. Here you go. Those are interesting facts, right? I don't know. I'm trying to figure out what's going on. They were registering some of them at the top level domain of XXX. And by the time XXX started, it had better analytics. And so in order to track how people were using, they dumped some of these names onto the XXX site because there was a fewer top domain which had better metrics. All right. Let me do one thing. I'm going to move on. Let me just say that I think the bottom line here is that we need to send it back because there are so many categories on this. And whether or not the KTP function was properly administered by the trial court on surveys, there was not a dearth of abundance of this. I think it can be weighed by the jury. Thank you for the break. Will you please record Angela Dunning from CoolieLLP3. As we all know, this action is a plaintiff's attempt to invalidate as generic one of the world's most famous valuable trademarks, Google. And interestingly, it is still number two most valuable trademark and is also the world's and the U.S.'s most visited site. So there's no reason to doubt that it is top of mind for just about anyone conducting internet searches. In this case, the district court correctly found that plaintiffs had failed to raise a genuine issue of material fact as to whether the Google mark is generic and they granted summary judgment for Google. And we're here to ask for a resonance. Okay, isn't this great? Is your position that the term she uses, a verb, is just a mechanical or a figurative form of linguistic analysis? Or just that in this case, I'm sure maybe they've developed some evidence on that from whether we have such controversial evidence on how, in terms of the use of this analogy, does it make a reasonable assertion to conclude that Google mark is generic? For usage in this case, Your Honor, it's irrelevant to the analysis. And I think I want to start with the summary judgment standard because I think that's really important in plaintiffs who misstated that. You said in this case, that's not your third argument. You said categorically and in case works. Is there something particular about this case that matters in your opinion? Your Honor, I don't want to speak to the hypothetical case, but I can imagine a scenario in which a word is used as a verb in a way that severs any tie to the trademark such that it can no longer serve as a designation of origin. And on the facts of that case, perhaps it would be appropriate to find genericity. No evidence of that is present in this case. So on the summary judgment standard, I just want to make clear, that Google's registrations satisfied its burden to show that there's no genuine issue. So the burden was on plaintiffs to come forward with sufficient probative evidence to establish its entitlement to verdict. And I just want to, you know, emphasize the fact that these registrations are incontestable and the registrations are for the Google search engine and related services. So the point of that is, in order to establish genericity, plaintiffs had to establish that Google has become generic for search engines. That is, people can refer to any search engine as a Google. And plaintiffs have said that there is 11 categories of evidence that support their claim of genericity. But that's not true because it doesn't go to the relevant issue in the cases the district court found. The undisputed evidence Google put in is that 94% of Internet users understand that Google is a trademark. That's what the primary significance test looks at. Do people understand that a mark is a trademark? Does it serve its trademark function of designating a particular source? That's the question I didn't answer. Let's say for some reason that you didn't have that piece of evidence. So all we have are the 11 or whatever number of categories of evidence that the plaintiffs have supported. Let's say that that evidence actually shows definitively that 95% of the time when people use Google as a term, they are referring to search engines as generic. And that was the state of the order. That's what I was trying to do. In that case, would the military be perhaps a reasonable jury to extrapolate from the terms used as a verb to how it's being used as a search engine? Your Honor, I don't believe that's the case. The question, again, is whether a mark is capable of serving as a designation of origin. So the Teflon survey that Google put in was designed to test whether people understood the trademark significance. How people use the mark is not in and of itself sufficient evidence. How we use it in casual conversation is not evidence of terrorism, as McCarthy tells us. You made reference to your survey, but I was trying to create hypothetical evidence that's not in the record, which is, I was curious, do you think that the hypothetical case I constructed, do you think people could be a jury or not? No, Your Honor. Again, it was plaintiff's burden in this case when we have a registered mark to show that the Google mark had become generic. In any case where you have a registered mark, the plaintiff has to come forward with sufficient evidence to be entitled to verdict. The fact that many people may use a mark casually in conversation as a verb or an adjective or some other part of speech doesn't answer the question whether its primary significance is as a trademark or not. That question goes to what people understand, the mind of the consumer. So that evidence is not sufficient. It was a plaintiff's burden, and they didn't need it. Does that answer your question better? Yeah, I don't think I agree with it. Let me take the Berger survey, because there was some question about that. This was the survey that plaintiffs put in and that they primarily rely on as evidence that Google has become generic. Mr. Berger, as an initial matter, that survey should have been an invisible in its entirety. Mr. Berger admitted a deposition that he designed it to prove that Google is generic instead of to test one of the hypotheses. He also admitted that his protocol has never been accepted. He asked one question. He was not able to identify a secret court treatise or article that has ever adopted that form of study. My colleague referred to that study as the Thermos survey. The Thermos survey that was actually conducted in that case went on to ask additional questions designed to find out whether people understood when they responded with Thermos that that was a brand or not. No such questions were asked here. That's why I was trying to find out from your comment whether it was a comprehensive survey. I think, Your Honor, Google's dismissive was not. I would also point out that it's not relevant. Relevance is part of the admissibility test. It was not relevant. Mr. Berger admitted a deposition that his survey was not designed to test the primary significance of the word Google. It was not designed to test whether consumers understand Google is the source of a particular search engine, and it was not designed to test whether Google has become a generic term for a search engine. Those are the only issues in the case, and it did not test for those. None of the other evidence that plaintiffs came forward established their burden to show genericity either. Take competitor use. There is no evidence in the record that any of Google's competitors has any problem advertising their own search engines without using Google. They don't advertise their services as Google's. They don't claim that one can Google on their services. They respect the trademark. As Judge Coleman pointed out, dictionaries consistently define the word Google with reference to its search engine or the company. They may also acknowledge that there is, in casual parlance, some reference to Google in a non-discriminative sense, but that is always secondary to the Google trademark. Plaintiffs also offered or attempted to offer the word surveys. Those were deemed inadmissible, and we submit that that was correct. They didn't ask how people understand the term. Mr. Berger didn't ask that either, but they didn't ask how people understand the term, whether they understand its trademark, and didn't give people the option of responding by saying that they used Google to use the Google search engine. The real crux of the dispute between Plaintiffs and Google here is Plaintiff's misunderstanding of the primary significance test. They want to make it about how people use the mark, not whether they understand it as a designation of words. The evidence on the pertinent question, whether it serves to designate Google as a single source, is uncontroverted and goes only one way. There is evidence established at most, and this is being generous, that Google is often used as a verb. But as I said, that doesn't make it relevant to the question of a fourth word. They certainly haven't established, even if you look at the Berger survey, that Google is primarily used as a verb, meaning to search any search engine. There's simply a gaping hole as to what people have used that term to mean. I think it's also important to emphasize McCarthy, because he's done a lot of work on this sort of issue. One can say, pass me a Kleenex, in casual conversation, because Kleenex may be a top-of-mind brand and very strong, while still knowing, having used it that way, that Kleenex is a brand, when you go to buy it, what's relevant for the primary significance test is actual consumer context. And there's no evidence on the record that when consumers are deciding which search engine to use, they don't understand that Google is its own search engine. Laura Heyman has also explained in her book on trademarks that top-of-mind verb usage, far from indicating that a word has become generic, is actually strength of the brand. In this case, again, as the predominant search engine, it's not surprising that people refer to Google by name. I also want to point out, the survey evidence is really not conflicting. You have the Ford survey that Google conducted that shows 94% of Internet users recognize Google as a brand. You have the Berger survey that showed that 51% of people when asked how they would instruct a friend to search the Internet would say, Google it. But there's nothing remotely inconsistent with almost everyone knowing that Google is a trademark. And on the other hand, people referring to Google by name when they ask someone to do a search. I guess I'd also like to address the anecdotal effect that the district court mentioned, because Kleenex raised that. This is, as Your Honor pointed out, an instance of Coke. For instance, when I order a Big Mac at Coke, I may not be inserting the words hamburger and cola after, because they're assumed, the brand is so strong, I don't need to do that. It's also possible when I order a Coke at a restaurant, I may be willing to accept any cola. I'm actually trying to order a Coke, but because of the way language works, the person I'm talking to understands that I might be willing to accept a different kind of cola. And so the response you might get is, well, we don't have Coca-Cola, but we have Pepsi, too. Here, when someone says, could you Google that for me, the evidence we put in, including linguistic evidence from Dr. Nunder, is that people, the vast majority of the time, actually mean Google, which is not surprising. But it's uttered in a context in which the other person understands that if Google isn't available, another search engine will, too. That is not evidence of generosity, as McCarthy and others have pointed out. I want to also just finally touch on the linguistics piece, because Plano's raised that as well. Both of Plano's linguistics experts testified at their deposition that Google serves as a trademark for the search engine. Dr. Farrell testified in a quote, Google functions as a trademark in identifying its search engine. Dr. Metcalf testified, quote, the word Google, when it is used as the name of a company where the name of the search engine is non-generic. Those linguists both were commenting in their reports about the way that language functions, but both agreed that Google functions as a trademark in designating Google's search engine. Under 15 U.S.C. 1064, the statute that Plano sued under, the question is whether Google has become a generic term for the goods or services or a portion thereof for which it is registered. Here, the registrations at issue are for the Google search engine and related services. So the question asked in this case, what complaint is required to prove, is that the Google trademark has become a generic term for any search engine? And they didn't even attempt to prove that essential proposition back in their opening brief to this court. They said that wasn't the issue, and they're just wrong on that. Unless the court has any questions, I believe I've covered everything I need to. Okay, thank you so much, your honors. We ask for affirmation of the summary judgment. Thank you. So I guess we can call it the Orenson Surveys. I think we're currently referencing that every so often. That wasn't the end result of that. But let's talk about that, because the Teflon survey was a survey performed by Google that tested whether the search engine was a brand or whether Google was a brand. Our Orenson Surveys actually asked whether or not people thought it was the name of a company or if it was a search engine. Those were the two ways we asked it. And in both of those times, we got a response of less than 28%. 28.7% thought it was a search engine, while 52.2% thought it was a search, and 19% thought it was just the Internet in general. Well, why didn't you also ask, do you understand it to be searching the Internet? So then they had a choice of 4 instead of 3. Well, we did ask you that search engine, and I think you wanted to know why it would be included on Google. And that was the definition that was declared to us until the court at the trial level came up with discriminative, indiscriminate, unregistered, uncertainties, and subscriptions. The whole burden that the plaintiff has here to show that the primary meaning in the mind of the user is to generically search the Internet as opposed to knowing that it's actually registered for a company called Google Inc. So why wouldn't you ask the question and give the consumer an option, believe, picking one or the other? Well, we asked the question, how do you primarily, how do you use, how do I most often use Google? And we had a focus on use, not understanding, because we weren't testing whether it was a search engine. We weren't testing the goods. We were testing firm usage and service. We weren't testing service. We were testing whether or not the usage, generically as a firm, because the Intis says firm usage is leading to genericity. The TTAB has 2 cases that say firm usage is generic usage, and one district court has referenced that firm usage as generic usage. So we were a whole case that's based on firm usage, and I don't see any way that Google can ever police the firm to Google as a trademark, and because of that, it needs to be found generic. And that's the basic principle that this case was gained on. In the mind of the people who are doing the searching, they also know that it is part of Google. Well, why isn't this just like an order of a Big Mac and a Coke, knowing that you might get a Pepsi before? Because I don't think they do. I don't know what you were thinking when you actually decided to Google it. If you were thinking Google, because that's your Google, we spitted out this from a company class, using a Coca-Cola to be a search engine. And it's done so well as a result of this case, and you can't do it before. And that's a registered part. It's a pretty valuable one, in fact. Well, it is valuable. But, again, we split it up. It's 352 media. The people said, hey, I found you, and the question back was, how did you find us? And they said, Google, right? And then they were able to find the resource, and then actually they Googled them on Bing, they Googled them on other browsers. So there was evidence there. And we split it in cartoons. There's no way to know about why cartoonists use this Google that translates into German if they're in Google. I think they wrote this as well. Is this registered? It's a US registered German cartoon. What's the relevancy of the German cartoon? Which I couldn't understand, because I don't speak German. Well, it wasn't the only cartoon. There were other cartoons. I don't agree with that one. Well, it wasn't relevant to show one thing, but it was relevant to show the word usage and how it's being used in the real world.  All right, well, thank you all for your time today. I'm Alfre Siddal. Thanks. This was very good. Thank you all.
judges: Tallman, Watford, Guirola